```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
ASESORES Y CONSEJEROS ACONSEC CIA,
S.A., d/b/a CORONEL Y PEREZ
ABOGADOS,

                Plaintiff,              OPINION

        -against-
                                        08 Civ. 9384 (MGC)

GLOBAL EMERGING MARKETS NORTH
AMERICA, INC.,

                Defendant.

----------------------------------X

APPEARANCES:

        VENABLE LLP
        Attorneys for Plaintiff
        1270 Avenue of the Americas
        New York, NY 10020

        By: Brian Christopher Dunning, Esq., Irene Ribeiro
          Gee, Esq.

        COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
        Attorneys for Defendant
        900 Third Avenue, 16th Floor
        New York, NY 10022

        By: Steven L. Klepper, Esq., Damon T. Kamvosoulis,
          Esq., and Neoma M. Ayala, Esq.
```

**Cedarbaum, J.**

Delaware investment bank Global Emerging Markets North America, Inc. ("GEM") retained the Ecuadorian law firm of Asesores y Consejeros Aconsec CIA, S.A ("Asesores") to conduct due diligence on an Ecuadorian consumer electronics company, Artefacta, which GEM planned to acquire.  Asesores completed the project and delivered its results, but the deal failed to close because GEM was unable to obtain financing.  GEM then refused to pay any fee on the ground that the agreement between the parties did not require payment unless the acquisition of Artefacta took place.  Asesores sued for breach of contract and equitable relief.

Beginning October 25, 2011, I conducted a two-day bench trial of Asesores' claim against GEM.  Three witnesses testified: Cesar Coronel Jones, Daniel Pino, and Julio Márquez.  Each of the witnesses' native language is Spanish, but each is fluent in English, and testified in English.  After considering all of the evidence including the credibility of the witnesses, I make the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## BACKGROUND

In November 2007, Andres Portaluppi, an Ecuadorian businessman, approached GEM regarding an opportunity to acquire a majority share of two related Peruvian and Ecuadorian

2

companies that sold consumer electronics and major appliances. Portaluppi was a minority shareholder in both companies and sought to buy out his business partners with GEM's assistance. GEM required extensive due diligence to be conducted on each of the companies.  Once GEM decided to acquire the South American companies, GEM sent one of its managing directors, Julio Márquez, to Ecuador to meet with law firms possessing the requisite due-diligence expertise.

Portaluppi arranged for Márquez to meet with Cesar Coronel Jones ("Coronel") and Hernán Perez ("Perez"), the founding partners of Asesores, in Ecuador on December 13, 2007.  In addition to discussing the firm's credentials, representatives of Asesores informed Márquez that the firm's practice was to bill by the hour for its services.  The following day, at a second meeting, Márquez informed Asesores that GEM intended to retain the firm's services.  Daniel Pino also attended this meeting.  At that time, Pino was a senior associate who would be primarily responsible for the due diligence.  Asesores was retained to conduct due diligence on Artefacta[1] and to assist in drafting the employment contracts that would carve up post-acquisition powers and responsibilities between GEM and Portaluppi.  According to all the witnesses, Márquez did not, at

---

[1] GEM retained a Peruvian law firm, Saco-Vertiz & Bellido ("Bellido"), to conduct due diligence on the Peruvian company.

that time, inform Asesores that GEM's payment of attorney's fees would be contingent on GEM's acquisition of Artefacta. Márquez testified that, at most, he told Asesores that it was GEM's "preference or . . . practice . . . or custom . . . to pay . . . if and when the deal closes."

The following Monday, December 17, 2007, Márquez requested that Pino send him a preliminary due diligence list and a draft of the firm's engagement agreement. The engagement letter Pino sent to Márquez stated that Asesores' lawyers and staff charged between $60 and $270 per hour, that any substantial expenses would be an additional charge, and that the firm expected a retainer of $20,000. The letter specified that invoices in both English and Spanish would be sent to GEM monthly. Further, the letter provided that bills must be paid upon receipt and that interest would be charged on any balances outstanding more than thirty days. Coronel testified that although signed engagement letters are not required by Ecuadorian law to prove a right to payment of legal fees, the firm had a general practice of drafting agreement letters. At this time, Márquez also instructed Pino not to wait for the engagement letter to be signed and returned before starting work because due diligence was needed urgently.

On December 28, 2007, since he had not received a signed agreement from GEM, Coronel asked Márquez whether GEM would be

4

signing the engagement letter. Márquez assured Coronel that it would and requested that the letter be resent. Eventually, on January 7, 2008, Márquez asked for two minor changes to the terms of the proposed agreement: that Asesores correct a section in which it had mistakenly substituted another company's name for GEM's, and that Asesores change the agreement so that future correspondence, including invoices, would be directed to Márquez's direct superior, Christopher Brown. Márquez did not object to the payment terms, nor did he inform Asesores that GEM would not pay any legal fees if the acquisition of Artefacta did not take place. Pino made the requested changes and returned the revised agreement to Márquez. Despite repeated inquiries by Coronel and Pino, neither Márquez nor Brown, nor anyone else at GEM, ever signed or returned the engagement letter. At one point, Márquez asked Asesores for wiring instructions so that GEM could remit the $20,000 retainer, but GEM never transferred any money.

Despite not having received GEM's signature on the engagement letter, Asesores continued to perform due diligence on Artefacta with the intention of completing the project by the initial target closing date of February 2008. Asesores' attorneys recorded their billable hours, and Asesores sent monthly billing records to Márquez by e-mail. The bills did not contain the term "invoice." Márquez testified that the e-mails

5

containing the charges were caught by his e-mail system's spam filter and delivered to a junk mail folder.  According to Márquez, he did not see the invoices until mid-April, when Asesores began demanding payment.  Coronel testified and e-mail records corroborate, however, that Coronel and Pino personally emailed Márquez as early as the end of February and throughout the succeeding months to inform him that GEM owed over $110,000 in unpaid legal fees.  In response, Márquez did not object to the claim for payment.  Rather, he either offered reassurances that payment was forthcoming or dodged the issue entirely.  As late as April 2008, Márquez told Asesores that he would seek payment of the invoices from Brown.

Asesores completed the bulk of the work by the end of January 2008 and delivered a report to GEM documenting the results of the due diligence it had performed.  By the end of March 2008, Asesores had completed all remaining work for GEM.  GEM was unable to obtain sufficient financing to acquire Artefacta, however, and the deal was delayed repeatedly before eventually falling apart entirely.[2]  On May 13, 2008 -- roughly two months after Asesores finished the last of its work for GEM -- Márquez emailed Pino to inform Asesores for the first time

---

[2] Portaluppi and the other shareholders of the South American companies instead swapped interests in the companies so that Portaluppi owned the Peruvian company and the other shareholders owned Artefacta.

that GEM did not intend to pay its legal fees. Márquez claimed that payment was not required because the deal did not close. He suggested that Asesores help GEM close the deal so that Asesores could be paid. Pino replied immediately that Asesores never agreed to payment only in the event of GEM's acquisition of Artefacta and insisted on full payment of the outstanding invoices as was required by the engagement letter. Negotiation between the parties to settle the outstanding debt was unsuccessful.

Márquez testified that GEM believed the fees charged by Asesores were excessive. According to Márquez, Bellido, the Peruvian law firm that investigated the Peruvian company, charged GEM roughly $30,000 in legal fees and expenses. Coronel testified that, each day, all Asesores professionals filled out time sheets showing the number of hours he or she worked that day and providing a brief description of the work completed. The time sheets were then reviewed by a supervising attorney and consolidated into a billing record. Asesores' billing records show that, during the relevant time period, its lawyers and staff billed the following number of hours resulting in the following fees plus expenses:

| Billing Period | Number of Hours | Total Fees | Expenses |
|---|---|---|---|
| December 1, 2007 - January 11, 2008 | 522.60 | $68,792.70 | $0 |
| January 12, 2008 - | 243.26 | $38,950.50 | $299.27 |

7

| | | | |
|---|---|---|---|
| January 31, 2008 | | | |
| February 1, 2008 - February 28, 2008 | 107.25 | $15,375.00 | $174.89 |
| March 1, 2008 - March 31, 2008 | 57.25 | $8,572.50 | $0 |
| **TOTAL** | 930.36 | $131,690.70 | $474.16 |

Thus, Asesores claims that it is owed $132,164.86, exclusive of interest and attorney's fees in this case.

Asesores filed the complaint on October 31, 2008. The complaint asserts three claims: (1) breach of contract; (2) *quantum meruit*; and (3) account stated. The complaint demands full payment of the unpaid invoices, statutory interest, and attorney's fees.

### DISCUSSION

**I. Choice of Law**

This is a diversity case. Accordingly, the choice of law rules of New York govern. Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933 F.2d 131, 137 (2d Cir. 1999). Under New York choice of law principles, when there is no "actual conflict between the laws of the jurisdictions involved," there need not be a determination of which law to apply because the application of either jurisdiction's law would provide the same result. In re Allstate Ins. Co. (Stolarz), 81 N.Y.2d 219, 223, 613 N.E.2d 936, 937 (1993). The parties conceded at trial that there is no substantive difference

between New York and Ecuadorian law on the breach of contract claim.

**II. Breach of Contract**

Under New York law, a contract need not be signed by either or both parties in order to be enforceable.  See Consarc Corp. v. Marine Midland Bank, N.A., 996 F.3d 568, 572-73 (2d Cir. 1993) (citing Weiner & Co. v. Teitelbaum, 483 N.Y.S.2d 313, 314 (1st Dep't 1985)); see also Pludeman v. N. Leasing Sys., Inc., 929 N.Y.S.2d 246, 248 (1st Dep't 2011) ("We note that there is no legal requirement that a party's signature appear at the end of a written agreement.").  In the absence of a signed writing, parties can demonstrate the existence of a contractual agreement by making a showing of the "objective manifestations of the intent of the parties as gathered by their expressed words and deeds."  Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp., 41 N.Y.2d 397, 399, 361 N.E.2d 999, 1001 (1977).  "A party's silence will be deemed an acquiescence where he or she is under such duty to speak that his or her 'conduct, accompanied by silence, would be deceptive and beguiling' and failure to speak therefore misleads the other party."  Russell v. Raynes Assocs. LP, 569 N.Y.S.2d 409, 414 (1st Dep't 1991) (quoting Brennan v. Nat'l Equitable Inv. Co., 247 N.Y. 486, 490, 160 N.E. 924, 925 (1928)).

I find that although the engagement letter between Asesores and GEM was never signed, GEM accepted the terms of Asesores' offer by its silence and by accepting the work performed by Asesores.  Even crediting Márquez's testimony that GEM never intended to accept the payment terms proposed by Asesores -- as evidenced by GEM's failure to sign the letter --  GEM's subjective intent is not enough to avoid enforcement of the contract.  Under New York law, if a party's objective actions support the conclusion that he accepted an agreement, he will be bound to it even if he never subjectively assented to the terms of the agreement.  Dodge Street, LLC v. Livecchi, 32 F. App'x 607, 611 (2d Cir. 2002) (citing Pollitz v. Wabash R. Co., 207 N.Y. 113, 129, 100 N.E. 721, 725 (1912)).  Here, Asesores regularly kept GEM abreast of its progress in conducting due diligence and delivered a completed due diligence report to GEM at the end of January 2008.  GEM received the report without objection.  Further, GEM not only failed to instruct Asesores to stop work on the ground that GEM had never signed the proposed retainer agreement, but it also urged Asesores to work quickly so that the Artefacta deal could close timely.  GEM cannot now claim that it never assented to the terms of the engagement letter.

Marquez testified that the bills sent by Asesores were caught by his spam e-mail filter because they were sent by an

administrative assistant at Asesores' office whom he had not verified as a legitimate correspondent. Based on this testimony, GEM argues that its silence should not be considered acquiescence. I did not find Márquez's testimony on this subject to be credible. But even if Márquez did not see the bills until April 2008, Coronel and Pino alerted Márquez via emails and telephone calls as early as February 2008 that GEM had an outstanding balance of over $100,000. Moreover, GEM accepted Asesores' report without objection.

    GEM argues that there was no meeting of the minds between the parties as to when and how Asesores would be paid. Márquez testified that the parties understood that payment was not required unless and until the Artefacta deal closed. I find Márquez's testimony on this issue not to be credible. Coronel and Pino both testified to the contrary -- namely, that Asesores' fees accumulated hourly and were due upon receipt of monthly bills regardless of whether GEM eventually acquired Artefacta. I found both witnesses to be entirely credible. Moreover, the documentary record supports their testimony. The only engagement letter contains no reference to Asesores' fees being contingent upon the success of the deal. When Márquez requested edits of the engagement letter, he did not object to the payment terms at all. Pino and Coronel contacted Márquez regarding payment throughout the parties' professional

relationship, and Márquez did not question Asesores' fees until the middle of May 2008, roughly five months after Asesores first sent the engagement letter to GEM.  The evidence does not support GEM's contention that there was no meeting of the minds.

GEM also argues that even if the retainer agreement were a valid contract, Asesores breached the agreement and therefore cannot recover.  GEM argues that Asesores: (1) failed to obtain a signature from GEM; (2) improperly submitted invoices to Márquez instead of Brown; (3) neglected to prepare invoices in both Spanish and English; and (4) failed to obtain the $20,000 retainer.  These arguments are unpersuasive.  A signature is not required for a valid contract, see supra, and thus the failure to obtain a signature cannot be a breach.  Although the acts of addressing the invoices to the wrong recipient and failing to translate the invoices into two languages technically contravene the terms of the agreement, neither constitutes a material breach.  Gompert v. Healy, 133 N.Y.S. 689, 690 (2d Dep't 1912) ("Substantial performance is performance; the deviations permitted being minor, unimportant, inadvertent, and unintentional.").  Finally, Asesores' inability to obtain the $20,000 retainer from GEM was caused by GEM's recalcitrance, not Asesores' breach.  GEM cannot plausibly argue that it was injured by not having to pay Asesores.

I find that Asesores has shown by a preponderance of the credible evidence that the engagement letter it sent to Márquez at the outset of its relationship with GEM constitutes an enforceable contract. GEM has breached that contract by failing to pay any of the legal fees it incurred during the engagement. GEM has not shown that Asesores breached the engagement agreement in any material way. In view of GEM's clear breach of the contract, it is unnecessary to reach Asesores' additional claims of *quantum meruit* and account stated.

**III. Damages**

Asesores is entitled to recover the full amount of the fees it charged as documented by the billing records it sent to GEM. As stated above, Asesores billed 930.36 hours, for which it charged $132,164.86, including expenses. New York provides for a prejudgment simple interest rate of nine percent. N.Y. C.P.L.R. § 5004. Where damages were incurred at various ascertainable times, "interest shall be computed upon each item from the date it was incurred." N.Y. C.P.L.R. § 5001(b). The engagement letter provided that interest was to accrue beginning thirty days after the submission of an invoice. Asesores submitted four invoices to GEM during the engagement. The following table shows the total fees and expenses billed on each invoice and the prejudgment interest that accrued on each:

| Billing | Billing | Interest Start | Total Fees + | Interest |
|---------|---------|----------------|--------------|----------|

13

| Period | Date | Date | Expenses | |
|---|---|---|---|---|
| 12/1/07 - 1/11/08 | 1/16/08 | 2/15/08 | $68,792.70 | $23,526.48 |
| 1/12/08 - 1/31/08 | 2/11/08 | 3/12/08 | $39,249.77 | $13,246.80 |
| 2/1/08 - 2/28/08 | 3/12/08 | 4/11/08 | $15,375.00 | $5,131.46 |
| 3/1/08 - 3/31/08 | 4/17/08 | 5/17/08 | $8,572.50 | $2,764.63 |
| | | | **TOTAL INTEREST:** | $44,669.37 |

An additional $44,669.37 in prejudgment interest has accrued. Thus, Asesores is entitled to recover $176,834.23 for GEM's breach of contract.

## CONCLUSION

The foregoing constitutes my findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a). For the foregoing reasons, Asesores has proven its claim of breach of contract by a preponderance of the credible evidence. Accordingly, the Clerk of the Court is directed to enter a judgment for the plaintiff in the amount of $176,834.23.

SO ORDERED.

Dated:   New York, New York
         January 10, 2012

S/_____
MIRIAM GOLDMAN CEDARBAUM
United States District Judge

14